[S.F. No. 25059. Mar. 31, 1988.]

JAN BROWN et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
ABBOTT LABORATORIES et al., Real Parties in Interest.

[And 68 other cases.]

COUNSEL

LeRoy Hersh, Nancy Hersh, Wes Wagnon, Dan Bolton and Hersh & Hersh for Petitioners.

Robert S. Schlifkin, Steven J. Kleifield, Schlifkin & Papell, Gerald C. Sterns, Wilda L. White and Sterns, Walker & Grell as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Gudmundson, Siggins & Stone, William S. Ginsburg, Crosby, Heafey, Roach & May, Richard J. Heafey, Peter W. Davis, James C. Martin, Tarkington, O'Connor & O'Neill, John D. O'Connor, Patrick J. Hogan, Adams, Duque & Hazeltine, Robert D. Phillips, Jr., Richard T. Davis, Jr., Boornazian, Jensen & Garthe, Norman La Force, Sedgwick, Detert, Moran & Arnold, Michael F. Healy, Kevin J. Dunne, Bronson, Bronson & McKinnon, Charles F. Preuss, Peter B. Logan, Haight, Dickson, Brown & Bonesteel, Robert L. Dickson, Ralph A. Campillo, Robert L. Kaufman and David J. Fleming for Real Parties in Interest.

David G. Owen as Amicus Curiae.

OPINION

MOSK, J.—In current litigation several significant issues have arisen relating to the liability of manufacturers of prescription drugs for injuries caused by their products. Our first and broadest inquiry is whether such a manufacturer may be held strictly liable for a product that is defective in design. The remaining questions relate to the scope of liability of producers of diethylstilbestrol (DES) under the market share theory enunciated in *Sindell* v. *Abbett Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] (hereafter *Sindell*). Specifically, we shall determine whether a plaintiff who proceeds under that theory may base her action on fraud or breach of warranty, and whether the manufacturers joined in the action are jointly and severally liable for any damages that may be awarded, or whether their liability is confined to their share of the relevant market for DES.

A number of plaintiffs filed actions in the San Francisco Superior Court against numerous drug manufacturers which allegedly produced DES, a substance plaintiffs claimed was used by their mothers to prevent

miscarriage. They alleged that the drug was defective and they were injured *in utero* when their mothers ingested it. The cases raised several common issues and, in order to facilitate their resolution and conserve judicial resources, the presiding judge, pursuant to a procedure recommended by the Judicial Council, designated the actions as "complex litigation." (Cal. Standards Jud. Admin., § 19 [Deering's Cal. Ann. Codes, Rules (Appen.) (1987 pocket supp.) p. 199].)

Each case was assigned its own number and had an independent existence, but the court's pretrial rulings on the law were made in a separate case with a separate number (830-109), and were to be binding on the other actions. At least 69 cases are involved. Under the court's order, additional cases may be governed by its rulings if actions subsequently filed present the same issues. The proceeding before us involves a series of pretrial rulings in case 830-109.

A typical complaint in the complex litigation names 170 or more drug companies as defendants. It is alleged that they manufactured DES from the same formula, and that the drug was unsafe for use in preventing miscarriage and resulted in severe injury to plaintiff. Defendants knew that the drug contained a cancer-causing substance, yet they failed to warn users or their physicians of these dangerous characteristics. Plaintiff seeks to hold defendants liable on theories of strict liability, breach of express and implied warranty, fraud, and negligence. In the event plaintiff is unable to identify the manufacturer of the specific brand of DES that caused her injuries, she seeks to hold liable "those defendant manufacturers who manufactured a substantial share of the appropriate market for said drug."

The trial court made pretrial rulings in favor of defendants on the issues stated above. That is, it determined that defendants could not be held strictly liable for the alleged defect in DES but only for their failure to warn of known or knowable side effects of the drug. It held further that neither breach of warranty nor fraud will lie in an action based on the market share theory of *Sindell*. Finally, the court ruled that defendants could not be held jointly and severally liable for the entire amount of the judgment if plaintiff prevails in the action, but that each defendant would be liable only for the proportion of the amount awarded that represented its share of the appropriate DES market.

Plaintiff sought a writ of mandate or prohibition in the Court of Appeal to review the foregoing rulings. That court issued an alternative writ and, after considering the issues, upheld the trial court's determination and denied a peremptory writ. We granted review to examine the conclusions of the Court of Appeal and its potential conflict with *Kearl* v. *Lederle*

*Laboratories* (1985) 172 Cal.App.3d 812 [218 Cal.Rptr. 453], on the issue of strict liability of a drug manufacturer for a defect in the design of a prescription drug.

### I. *Strict Liability*

#### A. *Strict Liability in General*

The doctrine of strict liability had its genesis in a concurring opinion by Justice Roger Traynor in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461 [150 P.2d 436]. He suggested that a manufacturer should be absolutely liable if, in placing a product on the market, it knew the product was to be used without inspection, and it proved to have a defect that caused injury. The policy considerations underlying this suggestion were that the manufacturer, unlike the public, can anticipate or guard against the recurrence of hazards, that the cost of injury may be an overwhelming misfortune to the person injured whereas the manufacturer can insure against the risk and distribute the cost among the consuming public, and that it is in the public interest to discourage the marketing of defective products. This court unanimously adopted Justice Traynor's concept in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal. 2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], holding a manufacturer strictly liable in tort and using the formulation of the doctrine set forth in *Escola*.

■ Strict liability differs from negligence in that it eliminates the necessity for the injured party to prove that the manufacturer of the product which caused injury was negligent. It focusses not on the conduct of the manufacturer but on the product itself, and holds the manufacturer liable if the product was defective.

In 1965, soon after our decision in *Greenman,* the Restatement Second of Torts published section 402A, which set forth the strict liability doctrine (hereinafter section 402A).[1] Almost all states have adopted some form of strict liability since that time. (Prosser & Keeton on Torts (5th ed. 1984) § 99, p. 694.)

---

[1] Section 402A provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if [¶] (a) the seller is engaged in the business of selling such a product, and [¶] (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. [¶] (2) The rule stated in Subsection (1) applies although [¶] (a) the seller has exercised all possible care in the preparation and sale of the product, and [¶] (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

This court refined and explained application of the principle in *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], and *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443] (hereafter *Barker*). In *Cronin,* we rejected the requirement of section 402A that the defect in a product must be "unreasonably dangerous" to the consumer in order to invoke strict liability, holding that the requirement "rings of negligence" (8 Cal.3d at p. 132) and that the showing of a defect which proximately caused injury is sufficient to justify application of the doctrine.

*Barker* defined the term "design defect" in the context of strict liability. In that case the plaintiff was injured while operating a piece of heavy construction equipment, and claimed that a safety device called an "outrigger" would have prevented the accident. We held that the defendant could be held liable for a defect in design.

*Barker* identified three types of product defects. (20 Cal.3d at p. 428.) First, there may be a flaw in the manufacturing process, resulting in a product that differs from the manufacturer's intended result. The archetypal example of such a defect was involved in *Escola, supra,* 24 Cal.2d 453, a Coca Cola bottle that exploded. Such a manufacturing defect did not exist in the heavy equipment that caused the injury in *Barker,* and is not alleged in the present case.

Second, there are products which are "perfectly" manufactured but are unsafe because of the absence of a safety device, i.e., a defect in design. This was the defect alleged in *Barker*. It held that a product is defectively designed if it failed to perform as safely as an ordinary consumer would expect when used as intended or reasonably foreseeable, or if, on balance, the risk of danger inherent in the challenged design outweighs the benefits of the design. (20 Cal.3d at p. 430.) Plaintiff asserts this test should be applied in the present case because DES contained a design defect.

The third type of defect identified in *Barker* is a product that is dangerous because it lacks adequate warnings or instructions. According to plaintiff, defendants here failed to warn of the dangers inherent in the use of DES. We are concerned, therefore, with the second and third types of defects described in *Barker*.

B. *Strict Liability and Prescription Drugs*

Even before *Greenman* was decided, the members of the American Law Institute, in considering whether to adopt a rule of strict liability, pondered whether the manufacturer of a prescription drug should be subject to the

doctrine. (38 A.L.I Proc. 19, 90-92, 98 (1961).) During a rather confusing discussion of a draft of what was to become section 402A, a member of the institute proposed that drugs should be exempted from strict liability on the ground that it would be "against the public interest" to apply the doctrine to such products because of "the very serious tendency to stifle medical research and testing." Dean Prosser, who was the reporter for the Restatement Second of Torts, responded that the problem was a real one, and that he had it in mind in drafting section 402A. A motion to exempt prescription drugs from the section was defeated on the suggestion of Dean Prosser that the problem could be dealt with in the comments to the section.[2] However, a motion to state the exemption in a comment was also defeated. (38 A.L.I. Proc. 19, 90-98, *supra.*) At the next meeting of the institute in 1962, section 402A was approved together with comment k thereto. (41 A.L.I. Proc. 227, 244 (1962).)

The comment provides that the producer of a properly manufactured prescription drug may be held liable for injuries caused by the product only if it was not accompanied by a warning of dangers that the manufacturer knew or should have known about. It declares: "*k. Unavoidably unsafe products.*[3] There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held

---

[2] One commentator has pointed out that at the 1961 meeting Dean Prosser proposed an exemption even broader than that suggested by the motion to exempt prescription drugs from strict liability. (Page, *Generic Product Risks: The Case Against Comment k and for Strict Tort Liability* (1983) 58 N.Y.U. L.Rev., 853, 863, 866.)

[3] We discuss in footnote 11, *post,* page 1069 plaintiff's assertion that comment k does not apply to all prescription drugs but only to those found to be "unavoidably dangerous."

to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

Comment k has been analyzed and criticized by numerous commentators. While there is some disagreement as to its scope and meaning, there is a general consensus that, although it purports to explain the strict liability doctrine, in fact the principle it states is based on negligence. (E.g., Schwartz, *Unavoidably Unsafe Products: Clarifying the Meaning and Policy Behind Comment K* (1985) 42 Wash. & Lee L.Rev. 1139, 1141; McClellan, *Drug Induced Injury* (1978) 25 Wayne L.Rev. 1, 2; Kidwell, *The Duty to Warn: A Description of the Model of Decision* (1975) 53 Tex.L.Rev. 1375, 1377-1378; Merrill, *Compensation for Prescription Drug Injuries* (1973) 59 Va.L.Rev. 1, 50.) That is, comment k would impose liability on a drug manufacturer only if it failed to warn of a defect of which it either knew or should have known. This concept focuses not on a deficiency in the product—the hallmark of strict liability—but on the fault of the producer in failing to warn of dangers inherent in the use of its product that were either known or knowable—an idea which "rings of negligence," in the words of *Cronin, supra,* 8 Cal.3d 121, 132.[4]

Comment k has been adopted in the overwhelming majority of jurisdictions that have considered the matter. (E.g., *DeLuryea* v. *Winthrop Laboratories, etc.* (8th Cir. 1983) 697 F.2d 222, 228-229; *Basko* v. *Sterling Drug, Inc.* (9th Cir. 1969) 416 F.2d 417, 425-426; *Stone* v. *Smith, Kline & French Lab.* (Ala. 1984) 447 So.2d 1301, 1303-1304; *Gaston* v. *Hunter* (1978) 121 Ariz. 33 [588 P.2d 326, 338-341]; *Chambers* v. *G.D. Searle & Co.* (D.Md. 1975) 441 F.Supp. 377, 380-381; *Johnson* v. *American Cyanamid Co.* (1986) 239 Kan. 279 [718 P.2d 1318, 1323].) In California, several decisions of the Courts of Appeal have embraced the comment k exemption (*Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 988-989 [95 Cal.Rptr. 381]; *Christofferson* v. *Kaiser Foundation Hospitals* (1971) 15 Cal.App.3d 75, 79-80 [92 Cal.Rptr. 825, 53 A.L.R.3d 292]; *Toole* v. *Richardson-Merrell Inc.* (1967)

---

[4] The test stated in comment k is to be distinguished from strict liability for failure to warn. Although both concepts identify failure to warn as the basis of liability, comment k imposes liability only if the manufacturer knew or should have known of the defect at the time the product was sold or distributed. Under strict liability, the reason why the warning was not issued is irrelevant, and the manufacturer is liable even if it neither knew nor could have known of the defect about which the warning was required. Thus, comment k, by focussing on the blameworthiness of the manufacturer, sets forth a test which sounds in negligence, while imposition of liability for failure to warn without regard to the reason for such failure is consistent with strict liability since it asks only whether the product that caused injury contained a defect. (See *Little* v. *PPG Industries, Inc.* (1978) 19 Wn.App. 812 [579 P.2d 940, 946].)

251 Cal.App.2d 689, 708-711 [60 Cal.Rptr. 398, 29 A.L.R.3d 988]), but this court has never spoken to the issue.[5]

We are aware of only one decision that has applied the doctrine of strict liability to prescription drugs. (*Brochu* v. *Ortho Pharmaceutical Corp.* (1st Cir. 1981) 642 F.2d 652, 654-657.)[6] Most cases have embraced the rule of comment k without detailed analysis of its language. A few, notably *Kearl* v. *Lederle Laboratories, supra,* 172 Cal.App.3d 812 (hereafter *Kearl*), have conditioned application of the exemption stated therein on a finding that the drug involved is in fact "unavoidably dangerous," reasoning that the comment was intended to exempt only such drugs from strict liability. (Accord, *Toner* v. *Lederle Laboratories* (1987) 112 Idaho 328 [732 P.2d 297, 303-309]; see also *Feldman* v. *Lederle Laboratories* (1984) 97 N.J. 429 [479 A.2d 374, 382-383] [involving allegations of a failure to warn, but stating that "whether a drug is unavoidably unsafe should be decided on a case-by-case basis."].) And in *Collins* v. *Eli Lilly Co.* (1984) 116 Wis.2d 166 [342 N.W.2d. 37, 52], it was held that comment k was applicable only if the drug in question was placed on the market without adequate testing because of exigent circumstances.[7]

We appear, then, to have three distinct choices: (1) to hold that the manufacturer of a prescription drug is strictly liable for a defect in its product because it was defectively designed, as that term is defined in *Barker,* or because of a failure to warn of its dangerous propensities even though such dangers were neither known nor scientifically knowable at the time of distribution;[8] (2) to determine that liability attaches only if a manu-

---

[5] Contrary to plaintiff's assertion, we did not "envision" the application of strict liability to prescription drugs in *Sindell.* That issue was not discussed in the opinion, although we relied on some of the policy considerations underlying strict liability in justifying modification of the rules of proximate cause in a manner we discuss below.

Nor do we agree with plaintiff's claim that *Carmichael* and *Toole* did not adopt comment k. Even though *Carmichael* was decided before *Barker* defined a design defect, *Carmichael's* holding that comment k applies to prescription drugs was not affected by that definition. *Toole* relied on and applied the comment k test, since its conclusion that the defendant was liable for the plaintiff's injuries was based on the defendant's failure to provide adequate warnings regarding dangers of the drug and to disclose certain test results to the government.

[6] In *Brochu,* the plaintiff had taken an oral contraceptive which contained 100 milligrams of estrogen as well as other ingredients. According to the evidence at trial, estrogen posed a serious risk of harm to her, and the defendant manufactured another contraceptive pill containing only 50 milligrams of estrogen which was equally effective.

[7] In her dissenting opinion in *Finn* v. *G.D. Searle & Co.* (1984) 35 Cal.3d 691, 705 [200 Cal.Rptr. 870, 677 P.2d 1147], Chief Justice Bird advocated a strict liability rule for prescription drugs based on the test set forth in *Barker.*

[8] We agree with the suggestion of a commentator that a manufacturer's knowledge should be measured at the time a drug is distributed because it is at this point that the manufacturer relinquishes control of the product. (Wade, *On the Effect in Product Liability of Knowledge Unavailable Prior to Marketing* (1983) 58 N.Y.U. L.Rev. 734, 753-754.)

facturer fails to warn of dangerous propensities of which it was or should have been aware, in conformity with comment k; or (3) to decide, like *Kearl* and *Toner* v. *Lederle Laboratories, supra,* 732 P.2d 297,303-309, that strict liability for design defects should apply to prescription drugs unless the particular drug which caused the injury is found to be "unavoidably dangerous."

We shall conclude that (1) a drug manufucturer's liability for a defectively designed drug should not be measured by the standards of strict liability; (2) because of the public interest in the development, availability, and reasonable price of drugs, the appropriate test for determining responsibility is the test stated in comment k; and (3) for these same reasons of policy, we disapprove the holding of *Kearl* that only those prescription drugs found to be "unavoidably dangerous" should be measured by the comment k standard and that strict liability should apply to drugs that do not meet that description.

### 1. *Design Defect*

*Barker,* as we have seen, set forth two alternative tests to measure a design defect: first, whether the product performed as safely as the ordinary consumer would expect when used in an intended and reasonably foreseeable manner, and second, whether, on balance, the benefits of the challenged design outweighed the risk of danger inherent in the design. In making the latter determination, the jury may consider these factors: "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (20 Cal.3d at p. 431.)

■■■ Defendants assert that neither of these tests is applicable to a prescription drug like DES. As to the "consumer expectation" standard, they claim, the "consumer" is not the plaintiff but the physician who prescribes the drug, and it is to him that the manufacturer's warnings are directed. A physician appreciates the fact that all prescription drugs involve inherent risks, known and unknown, and he does not expect that the drug is without such risks. We agree that the "consumer expectation" aspect of the *Barker* test is inappropriate to prescription drugs. ■■■■■ While the "ordinary consumer" may have a reasonable expectation that a product such as a machine he purchases will operate safely when used as intended, a patient's expectations regarding the effects of such a drug are those related to him by his physician, to whom the manufacturer directs the warnings

regarding the drug's properties.[9] The manufacturer cannot be held liable if it has provided appropriate warnings and the doctor fails in his duty to transmit these warnings to the patient or if the patient relies on inaccurate information from others regarding side effects of the drug.

 The second test, which calls for the balancing of risks and benefits, is inapposite to prescription drugs, according to defendants, because it contemplates that a safer alternative design is feasible. While the defective equipment in *Barker* and other cases involving mechanical devices might be "redesigned" by the addition of safety devices, there is no possibility for an alternative design for a drug like DES, which is a scientific constant compounded in accordance with a required formula. (See *Sindell,* 26 Cal.3d at p. 605.)

We agree with defendants that *Barker* contemplates a safer alternative design is possible, but we seriously doubt their claim that a drug like DES cannot be "redesigned" to make it safer. For example, plaintiff might be able to demonstrate at trial that a particular component of DES rendered it unsafe as a miscarriage preventative and that removal of that component would not have affected the efficacy of the drug. Even if the resulting product, without the damaging component, would bear a name other than DES, it would do no violence to semantics to view it as a "redesign" of DES.

Or plaintiff might be able to prove that other, less harmful, drugs were available to prevent miscarriage; the benefit of such alternate drugs could be weighed against the advantages of DES in making the risk/benefit analysis of *Barker*. As the Court of Appeal observed, defendants' attempt to confine the issue to whether there is an "alternative design" for DES poses the problem in an "unreasonably narrow" fashion. (See Comment, *The Failure to Warn Defect* (1983) 17 U.S.F. L.Rev. 743, 755-762.)

Of course, the fact that a drug with dangerous side effects may be characterized as containing a defect in design does not necessarily mean that its producer is to be held strictly liable for the defect. The determination of that issue depends on whether the public interest would be served by the imposition of such liability. As we have seen, the fundamental reasons underlying the imposition of strict liability are to deter manufacturers from marketing products that are unsafe, and to spread the cost of injury from the plaintiff to the consuming public, which will pay a higher price for the

---

[9] It is well established that a manufacturer fulfills its duty to warn if it provides adequate warning to the physician. (See, e.g., *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) 399 F.2d 121, 130; *Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 754 [137 Cal.Rptr. 417]; *Carmichael* v. *Reitz, supra,* 17 Cal.App.3d 958, 989.)

product to reflect the increased expense of insurance to the manufacturer resulting from its greater exposure to liability.

These reasons could justify application of the doctrine to the manufacturers of prescription drugs. It is indisputable, as plaintiff contends, that the risk of injury from such drugs is unavoidable, that a consumer may be helpless to protect himself from serious harm caused by them, and that, like other products, the cost of insuring against strict liability can be passed on by the producer to the consumer who buys the item. Moreover, as we observe below, in some cases additional testing of drugs before they are marketed might reveal dangerous side effects, resulting in a safer product.

But there is an important distinction between prescription drugs and other products such as construction machinery (*Barker*; *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465 [85 Cal.Rptr. 629, 467 P.2d 229]), a lawnmower (*Luque* v. *McLean* (1972) 8 Cal.3d 136 [104 Cal.Rptr. 443, 501 P.2d 1163]), or perfume (*Moran* v. *Faberge, Inc.* (1975) 273 Md. 538 [332 A.2d 11]), the producers of which were held strictly liable. In the latter cases, the product is used to make work easier or to provide pleasure, while in the former it may be necessary to alleviate pain and suffering or to sustain life. Moreover, unlike other important medical products (wheelchairs, for example), harm to some users from prescription drugs is unavoidable. Because of these distinctions, the broader public interest in the availability of drugs at an affordable price must be considered in deciding the appropriate standard of liability for injuries resulting from their use.

Perhaps a drug might be made safer if it was withheld from the market until scientific skill and knowledge advanced to the point at which additional dangerous side effects would be revealed. But in most cases such a delay in marketing new drugs—added to the delay required to obtain approval for release of the product from the Food and Drug Administration—would not serve the public welfare. Public policy favors the development and marketing of beneficial new drugs, even though some risks, perhaps serious ones, might accompany their introduction, because drugs can save lives and reduce pain and suffering.

If drug manufacturers were subject to strict liability, they might be reluctant to undertake research programs to develop some pharmaceuticals that would prove beneficial or to distribute others that are available to be marketed, because of the fear of large adverse monetary judgments. Further, the additional expense of insuring against such liability—assuming insurance would be available—and of research programs to reveal possible dangers not detectable by available scientific methods could place the cost of medication beyond the reach of those who need it most.

Dean Prosser summed up the justification for exempting prescription drugs from strict liability as follows: "The argument that industries producing potentially dangerous products should make good the harm, distribute it by liability insurance, and add the cost to the price of the product, encounters reason for pause, when we consider that two of the greatest medical boons to the human race, penicillin and cortisone, both have their dangerous side effects, and that drug companies might well have been deterred from producing and selling them.

"Thus far the courts have tended to hold the manufacturer to a high standard of care in preparing and testing drugs of unknown potentiality and in giving warning; but in the absence of evidence that this standard has not been met, they have refused to hold the maker liable for unforeseeable harm." (Prosser, Torts (4th ed. 1971) § 99, at p. 661, fns. omitted.)

The possibility that the cost of insurance and of defending against lawsuits will diminish the availability and increase the price of pharmaceuticals is far from theoretical. Defendants cite a host of examples of products which have greatly increased in price or have been withdrawn or withheld from the market because of the fear that their producers would be held liable for large judgments.

For example, according to defendant E.R. Squibb Sons, Inc., Benedictin, the only antinauseant drug available for pregnant women, was withdrawn from sale in 1983 because the cost of insurance almost equalled the entire income from sale of the drug. Before it was withdrawn, the price of Benedictin increased by over 300 percent. (132 Chemical Week (June 12, 1983) p. 14.)

Drug manufacturers refused to supply a newly discovered vaccine for influenza on the ground that mass innoculation would subject them to enormous liability. The government therefore assumed the risk of lawsuits resulting from injuries caused by the vaccine. (Franklin & Mais, *Tort Law and Mass Immunization Programs* (1977) 65 Cal. L.Rev. 754, 769 et seq.; *Feldman* v. *Lederle Laboratories* (1983) 189 N.J.Super. 424 [460 A.2d 203, 209].) One producer of diphtheria-tetanus-pertussis vaccine withdrew from the market, giving as its reason "extreme liability exposure, cost of litigation and the difficulty of continuing to obtain adequate insurance." (Hearing Before Subcom. on Health and the Environment of House Com. on Energy and Commerce on Vaccine Injury Compensation, 98th Cong., 2d Sess. (Sept. 10, 1984) p. 295.) There are only two manufacturers of the vaccine remaining in the market, and the cost of each dose rose a hundredfold from 11 cents in 1982 to $11.40 in 1986, $8 of which was for an insurance reserve. The price increase roughly paralleled an increase in the number of

lawsuits from one in 1978 to 219 in 1985. (232 Science (June 13, 1986) p. 1339.) Finally, a manufacturer was unable to market a new drug for the treatment of vision problems because it could not obtain adequate liability insurance at a reasonable cost. (N.Y. Times (Oct. 14, 1986) p. 10.)

There is no doubt that, from the public's standpoint, these are unfortunate consequences. And they occurred even though almost all jurisdictions follow the negligence standard of comment k. It is not unreasonable to conclude in these circumstances that the imposition of a harsher test for liability would not further the public interest in the development and availability of these important products.[10]

We decline to hold, therefore, that a drug manufacturer's liability for injuries caused by the defective design of a prescription drug should be measured by the standard set forth in *Barker*.

2. *Failure to warn*

■ For these same reasons of policy, we reject plaintiff's assertion that a drug manufacturer should be held strictly liable for failure to warn of risks inherent in a drug even though it neither knew nor could have known by the application of scientific knowledge available at the time of distribution that the drug could produce the undesirable side effects suffered by the plaintiff.

Numerous cases have recognized that a product may be defective because of the absence of a warning that was necessary to allow its safe use. (E.g., *Dimond* v. *Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 181, fn. 6. [134 Cal.Rptr. 895]; *Bojorquez* v. *House of Toys, Inc.* (1976) 62 Cal.App.3d 930, 933 [133 Cal.Rptr. 483]; *Dosier* v. *Wilcox-Crittendon Co.* (1975) 45 Cal.App.3d 74, 80-81 [119 Cal.Rptr. 135]; *Barth* v. *B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 244-245 [71 Cal.Rptr. 306]; *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 53-55 [46 Cal.Rptr. 552].) While some decisions apply strict liability principles to such a defect by holding that it is irrelevant whether the manufacturer knew of the danger or should have known of it (e.g., *Halphen* v. *Johns-Manville Sales Corp.* (La. 1986) 484 So.2d 110, 114; *Elmore* v. *Owens-Illinois, Inc.* (Mo. 1984) 673 S.W.2d 434, 438; *Carrecter* v. *Colson Equipment Co.* (1985) 346 Pa.Super. 95 [499 A.2d 326, 330-331]; *Little* v. *PPG Industries, Inc., supra,* 579 P.2d 940, 947; *Haugen* v. *Minnesota Mining and Manufacturing Co.* (1976) 15 Wn.App. 379 [550 P.2d 71, 76-77]), most jurisdictions hold to the contrary. That is,

[10] We express no opinion whether the products to which these examples relate were in fact beneficial to the public health. Our purpose is to demonstrate that there is a rational connection between the cost and availability of pharmaceuticals and the liability imposed on their manufacturers for injuries resulting from their use.

liability is conditioned on the actual or constructive knowledge of the risk by the manufacturer as of the time the product was sold or distributed. (*Basko* v. *Sterling Drug, Inc., supra,* 416 F.2d 417, 426; *Christofferson* v. *Kaiser Foundation Hospitals, supra,* 15 Cal.App.3d 75, 79-80; *Oakes* v. *E.I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 650-651 [77 Cal.Rptr. 709]; *Woodill* v. *Parke Davis & Co.* (1980) 79 Ill.2d 26 [37 Ill.Dec. 304, 402 N.E.2d. 194, 197-199]; *Moore* v. *Vanderloo* (Iowa 1986) 386 N.W.2d 108, 116; see *Kearl, supra,* 172 Cal.App.3d at p. 832; Kidwell, *The Duty to Warn, supra,* 53 Tex. L.Rev. 1375, 1395; Comment, *Undiscoverable Product Defects* (1983) 71 Geo. L.J. 1635, 1638-1639; note, *The Liability of Pharmaceutical Manufacturers for Unforeseen Adverse Drug Reactions* (1980) 48 Fordham L.Rev. 735, 752-753; and see cases collected in Annot. (1984) 33 A.L.R 4th 368.) This rule is consistent with comment j to section 402A, which confines the duty to warn to a situation in which the seller "has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge of . . . the danger."

It has been said that to "hold the manufacturer liable for failure to warn of a danger of which it would be impossible to know based on the present state of human knowledge would make the manufacturer the virtual insurer of the product. . . ." (*Woodill* v. *Parke Davis & Co., supra,* 402 N.E.2d 194, 199; accord, *Leibowitz* v. *Ortho Pharmaceuticals Corp.* (1973) 224 Pa.Super. 418 [307 A.2d 449, 458]; see Schwartz, *The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine* (1983) 58 N.Y.U. L.Rev. 892, 894-905.) The likelihood of the producer's liability would increase with significant advances in scientific knowledge, discouraging the development of new and improved drugs to combat disease. Thus, we disagree with plaintiff's assertion that defendants should be held liable for failing to warn the physician who prescribed DES to plaintiff's mother of alleged defects in the drug that were neither known by defendants nor scientifically knowable at the time the drug was distributed.

3. *The Kearl test*

■ One further question remains in this aspect of the case. Comment k, as we have seen, provides that the maker of an "unavoidably unsafe" product is not liable for injuries resulting from its use if the product is "properly prepared, and accompanied by proper directions and warning." With the few exceptions noted above, the courts which have adopted comment k have viewed all prescription drugs as coming within its scope.

*Kearl* suggested that not all drugs are "unavoidably dangerous" so as to merit the protection of the negligence standard of comment k, and it devised a test to separate those which meet that description from those which

do not. It held that the question whether a drug should be exempt from strict liability as "unavoidably dangerous" presents a mixed question of law and fact which should be decided on the basis of evidence to be taken by the trial judge out of the presence of the jury. The judge should determine, after hearing the evidence, "(1) whether, when distributed, the product was intended to confer an exceptionally important benefit that made its availability highly desirable; (2) whether the then-existing risk posed by the product was both 'substantial' and 'unavoidable'; and (3) whether the interest in availability (again measured as of the time of distribution) outweighs the interest in promoting enhanced accountability through strict liability design defect review." (172 Cal. App.3d at pp. 829-830, fn. omitted.) If these questions are answered in the affirmative the liability of the manufacturer is tested by the standards of comment k; otherwise, strict liability is the applicable test.

The Court of Appeal in the present case refused to adopt this approach on the ground that it required the trial judge to decide questions of fact which were ordinarily left to the jury, and that it presented the specter of inconsistent verdicts in various trial courts: in one case the question of liability for injuries caused by a specific drug would be tested by a negligence standard, while in another, involving the same drug, the judge might conclude that strict liability was the appropriate test.

We acknowledge that there is some appeal in the basic premise of *Kearl.* It seems unjust to grant the same protection from liability to those who gave us thalidomide as to the producers of penicillin. If some method could be devised to confine the benefit of the comment k negligence standard to those drugs that have proved useful to mankind while denying the privilege to those that are clearly harmful, it would deserve serious consideration. But we know of no means by which this can be accomplished without substantially impairing the public interest in the development and marketing of new drugs, because the harm to this interest arises in the very process of attempting to make the distinction.

Under the "mini-trial" directed by *Kearl,* a drug manufacturer has no assurance that a product he places on the market will be measured by the liability standard of comment k because a trial judge could decide that the benefit of the drug was not "exceptionally important" so as to make its availability "highly desirable," or that the interest in its availability did not outweigh the public's interest in subjecting the producer to strict liability. In determining whether the injury was "unavoidable" under the second prong of the test, *Kearl* requires that the trial court must consider "any alternative product that would have *as effectively* accomplished the *full intended purpose* of the . . . product." (172 Cal.App.3d at p. 830.) A

manufacturer's incentive to develop what it might consider a superior product would be diminished if it might be held strictly liable for harmful side effects because a trial court could decide, perhaps many years later, that in fact another product which was available on the market would have accomplished the same result. Further, the question of the superiority of one drug over another would have to be decided not in the abstract but in reference to the plaintiff, since the advantages of a drug cannot be isolated from the condition of a particular patient. Thus, in one case the drug that injured the plaintiff might be the better choice, while this would not be true as to another user.

An additional matter that militates against adoption of the *Kearl* approach is that, as the Court of Appeal observed, different trial judges might reach different conclusions as to whether the same drug should be measured by strict liability principles, because the determination in each case depends on the evidence as well as the subjective determination of the judge regarding such matters as what constitutes an "exceptionally important benefit" of a drug. We do not see how a reviewing court could harmonize these differing conclusions without ignoring the fundamental rule that a trial court's decision on the facts must be upheld if it is based on substantial evidence.

In addition, there is a danger of inconsistency between the findings of the judge and the jury in the same case. Some of the factors considered by the judge in making his determination whether the issue should be submitted to the jury on the basis of strict liability or negligence appear so similar to the matters considered by the jury in making the subsequent risk/benefit analysis required by *Barker,* that the judge in effect makes a preliminary determination whether a drug contains a design defect. If he determines that strict liability is the appropriate standard, the jury is required to make a second determination, based on factors and evidence similar to those considered by the judge, whether the drug was defectively designed. The possibility of conflicting conclusions by judge and jury is real.

*Kearl* gives the manufacturer a chance to avoid strict liability. But the eligibility of each drug for favorable treatment must be tested at a trial, with its attendant litigation costs, and the drug must survive two risk/benefit challenges, first by the judge and then by the jury. In order to vindicate the public's interest in the availability and affordability of prescription drugs, a manufacturer must have a greater assurance that his products will not be measured by a strict liability standard than is provided by the test stated in *Kearl.* Therefore, we disapprove the portion of *Kearl* which holds that

comment k should not be applied to a prescription drug unless the trial court first determines that the drug is "unavoidably dangerous."[11]

In conclusion, and in accord with almost all our sister states that have considered the issue, we hold that a manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution.[12]

## II. *Sindell Issues*

### A. *Breach of express and implied warranty and fraud*

*Sindell,* like the present case, involved a plaintiff who alleged she was injured by DES which her mother took during pregnancy to prevent miscarriage. She filed an action against a number of drug manufacturers, alleging they had all produced DES, and she stated causes of action for negligence, strict liability, violation of express and implied warranties, and false and fraudulent representations. After the plaintiff admitted that she could not identify the manufacturer which made the DES taken by her mother, the trial court sustained the defendants' demurrers without leave to amend and dismissed the action.

---

[11] While *Kearl* does not place great emphasis on the language of comment k as the basis of its holding, plaintiff as well as amici curiae focus on the language of the comment in support of their assertion that it cannot be interpreted to grant blanket immunity from strict liability to all prescription drugs, but only to those which are "unavoidably dangerous." We concede that the language of the comment is unclear in this respect. Some portions suggest that it is to apply to all prescriptions drugs (the comment describes the products to which it applies as those which "in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use"). Other passages distinguish among drugs ("many . . . drugs, vaccines and the like" are not "unreasonably dangerous" if they are "properly prepared, and are accompanied by appropriate warnings").

Nevertheless, we are of the view that the comment was intended to and should apply to all prescription drugs. As we note above, almost all jurisdictions that have adopted the rule stated in the comment view its provisions as granting immunity from strict liability to all such drugs. In addition, as we make clear from our discussion of *Kearl,* the benefit of the negligence standard stated in the comment would be greatly diminished if all drugs were required to run the gauntlet of a risk/benefit analysis in order to qualify for application of the standard.

[12] Our conclusion does not mean, of course, that drug manufacturers are free of all liability for defective drugs. They are subject to liability for manufacturing defects, as well as under general principles of negligence, and for failure to warn of known or reasonably knowable side effects.

It should also be noted that the consumers of prescription drugs are afforded greater protection against defects than consumers of other products, since "the drug industry is closely regulated by the Food and Drug Administration, which actively controls the testing and manufacture of drugs and the method by which they are marketed, including the contents of warning labels." (*Sindell, supra,* 26 Cal.3d at p. 609.)

This court reversed the judgment. We acknowledged the usual rule that a plaintiff has the burden of showing that the damages suffered were caused by the defendant, but held that modification of the rule was warranted under the circumstances. We observed that our modern, complex, industrialized society had created fungible goods like DES that harmed consumers but could not be traced to a specific producer. For the same reasons of policy that were the impetus for the creation of the doctrine of strict liability, we reasoned that the manufacturers of DES should not be rendered immune from all responsibility for injuries caused by the drug because DES daughters could not identify the particular brand of the drug taken by their mothers a generation ago. In order to afford relief to those who could not identify the specific manufacturer, we declared the market share doctrine. We held that if a plaintiff joins in the action the manufacturers of a substantial share of the DES that her mother might have taken, the burden of proof is shifted to defendants to demonstrate that they could not have supplied the DES which caused the injuries.

Plaintiff here alleges that if she cannot identify the manufacturer of the DES taken by her mother, she will proceed under the market share doctrine. The complaint charges that defendants expressly warranted that DES was safe to use as a miscarriage preventative and impliedly warranted that it was of merchantable quality, and that they made false representations to plaintiff's mother that DES had been tested and found safe for that purpose, knowing this was untrue.

The Court of Appeal held these causes of action could not be maintained under a market share theory because plaintiff will be unable to prove that all manufacturers made the same representations and warranties. It also stated that since plaintiff herself did not ingest the drug, difficult questions would arise as to whether she should be allowed to rely on misrepresentations and breaches of warranty allegedly made to her mother.

Plaintiff urges us to hold that the same policies which led to our modification of the rules of causation and liability in *Sindell* justify allowing her to demonstrate the elements of breach of warranty and fraud by a showing that all defendants made common misrepresentations concerning the safety and efficacy of DES.

In order to prevail in an action for fraud, a plaintiff must show that the defendant made misrepresentations upon which he relied to his

detriment, and that such misrepresentations were made with fraudulent knowledge or intent. (Civ. Code, §§ 1572, 1709, 1710).[13]

■ These requirements present formidable problems of proof for a person in plaintiff's position. She would be required to show that misrepresentations were made to her, and that she relied on them to her detriment. Although there is authority for the proposition that the reliance of a patient's physician on misrepresentations and warranties of a drug company will satisfy the reliance element in warranty and fraud actions (*Toole* v. *Richardson-Merrell, Inc. (1967)* 251 Cal.App.2d 689, 707 [60 Cal.Rptr. 398, 29 A.L.R.3d 988), it is plaintiff and not her mother who brings the present suit. She seeks to avoid this dilemma by asserting that while she was *in utero* her mother was her agent for the purpose of receiving and relying on representations made by the manufacturer of DES to her mother's doctor. Even if we were inclined to allow the piling of one fictional concept on another in this manner, plaintiff would still be unable to make out a case of fraud on a market share theory, for she must show not only the fact that common representations were made by defendants but also the state of mind or knowledge of the defendant making them. Plaintiff does not suggest any means by which such matters can be demonstrated without reference to the state of mind of a particular manufacturer, nor can we conceive of any.

■ An action for breach of express warranty requires that the seller of goods conform to his promises concerning them (Cal. U. Com. Code, § 2313, subd. (1)(a)), and may also require reliance on the promise by the plaintiff (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 115-116 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282]). An implied warranty that goods are "fit for the ordinary purposes for which such goods are used" arises from a contract of sale (Cal. U. Com. Code, § 2314, subd. (2)(c)); such a warranty does not require an express promise by the seller (*Hauter, supra,* at p. 117).

---

[13] Section 1572 defines actual fraud as follows: "Actual fraud, . . . consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; [¶] 3. The suppression of that which is true, by one having knowledge or belief of the fact; [¶] 4. A promise made without any intention of performing it; or, [¶] 5. Any other act fitted to deceive."

Section 1709 provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

Section 1710 states: "A deceit, within the meaning of the last section, is either: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [¶] 3. The suppression of a fact, by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or, [¶] 4. A promise, made without any intention of performing it."

■ Plaintiff's breach of warranty claims are inconsistent with our determination on the issue of strict liability for design defects. We have concluded above that a manufacturer of prescription drugs is not strictly liable for injuries caused by such a defect that is neither known nor knowable at the time the drug is distributed. To hold nevertheless that the manufacturer's representation, express or implied, that a drug may be prescribed for a particular condition amounts to a warranty that it is "fit" for and will accomplish the purpose for which it is prescribed (Cal. U. Com. Code, §§ 2314, subd. (2)(c), 2313, subd. (l)(a)), and to allow an action for personal injury for the breach of such warranties, would obviously be incompatible with our determination regarding the scope of a drug manufacturer's liability for product defects.

We hold, therefore, that a plaintiff who proceeds on a market share theory may not prosecute a cause of action for fraud or breach of warranty.[14]

## B. *Joint and Several or Several Liability*

■ The last issue we determine is whether the defendants found liable in a market share action are to be held jointly and severally liable for the judgment or whether, as defendants here assert, each defendant should be liable only for the portion of a plaintiff's damages that corresponds to the percentage of its share of the relevant market for DES.

The consequences of these methods of determining liability are markedly different. If such defendants are jointly and severally liable, a plaintiff may recover the entire amount of the judgment from any of the defendants joined in the action. Since the plaintiff is required under *Sindell* to join the manufacturers of only a substantial share of the appropriate market for DES, it follows that if joint liability were the rule, a defendant could be held responsible for a portion of the judgment that may greatly exceed the percentage of its market share. Under several liability, in contrast, because each defendant's liability for the judgment would be confined to the percentage of its share of the market, a plaintiff would not recover the entire amount of the judgment (except in the unlikely event that all manufacturers were joined in the action) but only the percentage of the sum awarded that is equal to the market shares of the defendants joined in the action. In the one case, it would be the plaintiff who would bear the loss resulting from the

---

[14] Since our holding regarding plaintiff's breach of warranty claims is founded on the inconsistency between such claims and our conclusion that prescription drugs are not subject to strict liability for design defects, our determination that a cause of action for breach of warranty does not lie against a prescription drug manufacturer is applicable whether or not the plaintiff proceeds under the market share doctrine.

fact that some producers of DES that might have been found liable under the market share theory were not joined in the action (or if a defendant became insolvent), whereas in the other such losses would fall on the defendants. Since, as we pointed out in *Sindell,* there is little likelihood that all manufacturers of DES in the appropriate market would be amenable to suit, the adoption of one or the other basis for liability could significantly affect the amount of a plaintiff's recovery and, concomitantly, a defendant's liability.

The Court of Appeal, in affirming the trial court's ruling that defendants could be held only severally liable in a market share action, correctly noted that while the complaint in *Sindell* alleged that the defendants were jointly and severally liable for the plaintiff's injuries, the opinion did not address the issue.

Plaintiff's arguments in favor of joint liability are based largely on her reading of *Sindell.* She claims that defendants are ordinarily jointly and severally liable for a plaintiff's injuries, and if this court had intended a different rule as to defendants in a market share action, it would have said so. We need not labor unduly over her assertion. The question of joint liability was not considered in *Sindell,* and this omission should not be read as an implied holding in favor of such a rule.

The passages from the opinion cited by plaintiff do not, as she suggests, lead inevitably to the conclusion that defendants in a market share action are jointly liable for payment of a plaintiff's damages. She claims that the requirement of *Sindell* that a plaintiff must join as defendants the manufacturers of a "substantial share" of the relevant DES market is itself an indication that defendants are jointly liable. If each defendant is to be liable only for a percentage of the judgment represented by its market share, she asserts, there would be no reason for the "substantial share" requirement. (See *Murphy* v. *E.R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672, 700, 701 [221 Cal.Rptr. 447, 710 P.2d 247], dis. opn. of Kaus, J.) But *Sindell* provides an altogether different reason for the "substantial share" requirement: its purpose is to diminish the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the drug which caused the plaintiff's injuries. (26 Cal.3d at p. 612.)

Another passage in the opinion which plaintiff claims supports her position is the statement that after a plaintiff in a market share action has met her burden of joining the required defendants, "they in turn may cross-complain against other DES manufacturers, not joined in the action, which they can allege might have supplied the injury-causing product." (*Id.* at p. 612.) Plaintiff asserts that if each defendant contributed to the judgment

according to its market share, there would be no incentive for it to join other manufacturers, and therefore this statement indicates that defendants are jointly liable. But there are a number of reasons why a defendant manufacturer might wish to cross-complain against another not joined in the action. For example, as the decision itself suggests, a defendant might desire to show that another producer made the DES that caused the injury; the presence in the action of additional defendants might assist in providing a more complete picture of the relevant market, thereby possibly diluting a defendant's ultimate liability; or the addition of another defendant could assist with the burden of defending the action. In sum, there is nothing in the language of *Sindell* which leads necessarily to the conclusion that defendants in a market share action are to be held jointly liable for a plaintiff's damages.

Instead of endeavoring to draw inferences from the language of *Sindell* as to an issue that the case did not decide, in determining whether defendants should be held jointly liable we look to the purposes underlying the market share principle and whether joint liability will promote those purposes.

In creating the market share doctrine, this court attempted to fashion a remedy for persons injured by a drug taken by their mothers a generation ago, making identification of the manufacturer impossible in many cases. We realized that in order to provide relief to an injured DES daughter faced with this dilemma, we would have to allow recovery of damages against some defendants which may not have manufactured the drug that caused the damage. To protect such defendants against excessive liability, we considered and rejected three separate theories of liability suggested by the plaintiff, and formulated, instead, the market share concept.

We explained the basis of the doctrine as follows: In order to decrease the likelihood that a manufacturer of DES would be held liable for injuries caused by products not of its making, and to achieve a reasonable approximation of its responsibility for injuries caused by the DES it produced, the plaintiff should be required to join in the action the manufacturers of a substantial share of the relevant DES market. If this were done, the injustice of shifting the burden of proof to defendants to exonerate themselves of responsibility for the plaintiff's injuries would be diminished. Each defendant would be held liable for the proportion of the judgment represented by its market share, and its overall liability for injuries caused by DES would approximate the injuries caused by the DES it manufactured. A DES manufacturer found liable under this approach would not be held responsible for injuries caused by another producer of the drug. The opinion acknowledged that only an approximation of a manufacturer's liability could be achieved by this procedure, but underlying our holding was a recognition that such a

result was preferable to denying recovery altogether to plaintiffs injured by DES.

It is apparent that the imposition of joint liability on defendants in a market share action would be inconsistent with this rationale. Any defendant could be held responsible for the entire judgment even though its market share may have been comparatively insignificant. Liability would in the first instance be measured not by the likelihood of responsibility for the plaintiff's injuries but by the financial ability of a defendant to undertake payment of the entire judgment or a large portion of it. A defendant that paid a larger percentage of the judgment than warranted by its market share would have the burden of seeking indemnity from other defendants (Code Civ. Proc., § 875; *American Motorcycle Association* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]), and it would bear the loss if producers of DES that might have been held liable in the action were not amenable to suit, or if a codefendant was bankrupt. In short, the imposition of joint liability among defendant manufacturers in a market share action would frustrate *Sindell's* goal of achieving a balance between the interests of DES plaintiffs and manufacturers of the drug.

This holding is consistent with the views of commentators who, with a few exceptions, have concluded that *Sindell* in effect held or should have held that defendants are not jointly liable for damages in a market share action. (Schwartz & Mahshigian, *Failure to Identify the Defendant in Tort Law: Towards a Legislative Solution* (1985) 73 Cal.L.Rev. 941, 957; note, *Sindell v. Abbott Laboratories: A Market Share Approach to DES Causation* (1981) 69 Cal.L.Rev. 1179, 1194; Comment, *The Market Share Theory: Sindell's Contribution to Industry-Wide Liability* (1981) 19 Hous. L.Rev. 107, 131-132; note, *Products Liability* (1981) 34 Okla.L.Rev. 843, 853; note, *Market Share Liability: An Answer to the DES Causation Problem* (1981) 94 Harv. L.Rev. 668, 673; note, *DES: Judicial Interest Balancing and Innovation* (1981) 22 B.C.L.Rev. 747, 770, 774.)

■ Finally, plaintiff proposes an alternate means to apportion liability among defendants. She suggests that if we conclude that joint liability is not appropriate, each defendant's liability should be "inflated" in proportion to its market share in an amount sufficient to assure that plaintiff would recover the entire amount of the judgment. While this ingenious approach would not be as unjust to defendants as joint liability, we decline to adopt the proposal because it would nonetheless represent a retreat from *Sindell's* attempt to achieve as close an approximation as possible between a DES manufacturer's liability for damages and its individual responsibility for the injuries caused by the products it manufactured.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Petitioners' application for a rehearing was denied May 4, 1988.