Filed 11/19/14

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHRISTINE SCOTT et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>C. R. BARD, INC.,<br><br>    Defendant and Appellant. | F066039<br><br>(Super. Ct. No. CV-266034)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. William D. Palmer, Judge.

Law Offices of Eugene R. Lorenz and Eugene R. Lorenz; and Elaine Houghton for Plaintiffs and Appellants Christine Scott and Roy Scott.

Reed Smith, Michael K. Brown, Raymond A. Cardozo, Eric J. Buhr, Kevin G. Lohman and Anne M. Grignon for Defendant and Appellant C. R. Bard, Inc.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 1.C.c. and 1.C.d. of the DISCUSSION.

Defendant C.R. Bard, Inc. (Bard) manufactured and sold polypropylene mesh kits to treat women with pelvic organ prolapse. Bard's product was surgically implanted in plaintiff Christine Scott. Christine Scott suffered serious complications and filed the underlying lawsuit against Bard for personal injuries. Plaintiff Roy Scott, Christine Scott's husband, sought damages for loss of consortium.

The jury found Bard was negligent and awarded the Scotts $5.5 million in damages. The jury also found that Christine Scott's surgeon, a nonparty, was 40 percent at fault and the trial court reduced the award accordingly.

On appeal, Bard contends the three negligence theories submitted to the jury were erroneous as a matter of law. Bard alternatively argues that the verdict is not supported by substantial evidence. Bard additionally asserts it was denied a fair trial due to the admission of evidence of postsurgery events, attorney misconduct and juror misconduct. In their appeal, the Scotts argue that the apportionment of fault to Christine Scott's surgeon cannot stand because it was based on incorrect jury instructions.

The negligence theories were properly submitted to the jury and the negligence finding is supported by substantial evidence. Further, Bard was not denied a fair trial. The Scotts acquiesced in the giving of incomplete jury instructions on the surgeon's fault when it was in their best interest for the jury to be properly instructed on that issue. Thus, the Scotts are estopped from asserting this instructional error on appeal. Accordingly, the judgment is affirmed.

## BACKGROUND

### 1. *Pelvic organ prolapse.*

Pelvic organ prolapse occurs when a woman has weak vaginal walls that allow adjoining organs, the uterus, the bladder, and/or the rectum, to drop into the vaginal canal. This condition can cause organ dysfunction, such as incontinence, pelvic pressure

2.

and pain. Pelvic organ prolapse can significantly impact a woman's quality of life and, in severe cases, cause a woman to become physically disabled.

If noninvasive treatments, such as exercises, are not effective, there are various surgical options for pelvic organ prolapse. For example, repairs can be done using the patient's own tissue. However, because poor tissue causes the problem, the procedure using that tissue has a high failure rate over time.

Another repair option is to use polypropylene mesh to support the vagina. One way to implant this mesh is through an abdominal incision. Beginning around 2003, surgeons began using kits to implant the mesh transvaginally, i.e., through the vagina. At issue here are two such transvaginal mesh kits sold by Bard.

## 2. *Bard's development and sale of the Avaulta products.*

In 2005, Sofradim, a French company, developed "Ugytex Dual Knit Mesh" to repair pelvic organ prolapse. Ugytex is a polypropylene mesh that has a soft center section with stronger sections on the side. Bard and Sofradim entered into an agreement for Bard to sell Ugytex in the United States under the name Avaulta.

Thereafter, Bard developed its own transvaginal mesh kit called "Avaulta Solo." This design is different from the Sofradim product. Avaulta Solo has a soft knit center graft with four stronger knit arms that are pulled back out through the body to anchor the graft in place. The kit also includes a large curved needle called a trocar that is used to snare and guide the mesh.

In 2007, Bard started selling "Avaulta Plus." The only difference between Avaulta Solo and Avaulta Plus is that Avaulta Plus has a collagen layer on the center portion of the mesh. These products were sold by prescription.

The Food and Drug Administration (FDA) regulates transvaginal mesh as a medical device. Before placing the Avaulta products on the market, Bard obtained a pre-market clearance from the FDA. A clearance means the FDA has determined that the

device is substantially similar to a device that is already on the market. Avaulta Solo and Avaulta Plus were cleared on the ground that they were substantially equivalent to the Sofradim product, Ugytex/Avaulta. In contrast, FDA approval means the FDA has determined that the product is safe and effective.

In developing Avaulta Plus, Bard performed functional, mechanical, biological, quality and biocompatibility tests. As part of the testing, pieces of mesh were placed in rats, rabbits and sheep. However, the stiffer mesh arms were not implanted in the animals. The product was also tested on cadavers.

**3.** ***Bard's physician training program.***

As part of marketing its products, Bard offered physicians training through its MDU Physician Education Continuum. The education options included large classes, smaller regional labs, and surgery observations.

In February 2007, Christine Scott's gynecologist, Dr. Tillaikarasi Kannappan, attended a one day session relating to Avaulta taught by Dr. Susan Tate, a urogynecologist. The session included a power point presentation and a cadaver lab. During the cadaver lab, Dr. Kannappan was shown the proper technique for implanting Avaulta but was not instructed on either removing mesh or diagnosing when mesh should be removed. According to Dr. Kannappan, she was told there could be complications but that they were minimal. Dr. Kannappan recalled being told Avaulta could cause minimal erosion but that the problem could be dealt with as an outpatient procedure in the office by trimming the mesh. Dr. Kannappan's overall impression was that Avaulta was very safe to use and was a superior product. She was not informed that Avaulta should not be used in sexually active women or for a mild prolapse. Dr. Kannappan was provided with the Avaulta instructions for use and a DVD showing another doctor's implant technique.

4.

**4.**      *Christine Scott's surgeries and complications.*

Christine Scott sought medical care for urinary incontinence she experienced while participating in sports. She was also diagnosed with mild pelvic prolapse of the bladder and rectum. As a remedy, Dr. Kannappan recommended surgical insertion of a mesh sling for the incontinence and surgical repair with two Avaulta Plus mesh kits, anterior and posterior, for the prolapse.

In January 2008, Dr. Kannappan performed surgery on Christine Scott and implanted the Avaulta Plus anterior and posterior mesh and a mesh sling. Avaulta Plus was not on the market when Dr. Kannappan attended the Bard training session in 2007. But, about a week before Christine Scott's surgery, Dr. Kannappan watched a DVD on the surgical technique for Avaulta Plus. However, Dr. Kannappan did not read the instructions for use.

Postsurgery, Christine Scott experienced complications. She could not urinate, had to self-catheterize, and was in pain. Dr. Kannappan operated again in February 2008 but this did not resolve the urination problem. Dr. Gregory Klis, Dr. Kannappan's colleague at the same practice, performed a third surgery on Christine Scott in May 2008 and a fourth surgery in July 2008. Christine Scott developed an infection and in November 2008, Dr. Klis conducted a fifth surgery to irrigate an abscess.

Dr. Klis referred Christine Scott to UCLA urogynecologist Dr. Christopher Tarnay. Dr. Tarnay conducted a sixth surgery to extrude more mesh and release mesh tension. Thereafter, Dr. Tarnay discovered that the mesh had eroded into Christine Scott's rectal area. Erosion occurs when the mesh does not stay in place but rather goes into a different space. Christine Scott then underwent her seventh and eighth surgeries performed by Dr. Tarnay and Dr. James Yoo, a colorectal surgeon.

Christine Scott is often in excruciating pain due to nerve damage, has pain during sexual intercourse, and has lost control of her bowels.

5.

**5.** *The FDA's public health notifications and requests for postmarket studies.*

In October 2008, after Christine Scott's surgery, the FDA issued a public health notification to health care practitioners. This notification discussed risks of transvaginal mesh procedures and recommended physicians "'[o]btain specialized training for each mesh placement technique,'" and "'[b]e vigilant for potential adverse events from the mesh, especially erosion and infection.'" The notification also suggested warning patients that the implantation of surgical mesh is permanent and that some complications associated with mesh may require additional surgery that may or may not correct the complication.

The FDA issued a second public health notification in July 2011. This notification repeated what was in the October 2008 public health notification and added that serious complications associated with transvaginal mesh surgeries are not rare.

In January 2012, the FDA wrote letters to approximately 30 manufacturers, including Bard, requesting that they conduct postmarket clinical studies or collect clinical data for transvaginal mesh. Bard responded that it would like to take the Avaulta product off the market. According to Bard, removing Avaulta Plus from the market was purely a business decision based on the market having moved to the next generation of products. Bard did not decide to stop selling Avaulta Plus because of any concern with the safety and efficacy of the product.

**6.** *The underlying litigation.*

In January 2009, Christine Scott and her husband, Roy Scott, filed a complaint for negligence, strict product liability, negligent misrepresentation and fraud against Bard, Dr. Kannappan, and Dr. Klis. The Scotts dismissed the action as to Dr. Klis. The action was bifurcated with the trial on the causes of action against Dr. Kannappan to follow the trial on the causes of action against Bard.

The trial court heard motions in limine two months before trial. One of the trial court's rulings barred evidence of postsurgery regulatory actions, including the FDA's 2008 and 2011 public health notices and 2012 letter requesting clinical trials. Nevertheless, the trial court advised the parties that with the in limine motions they "are not pouring any concrete" and that the rulings would "remain in place until and if something changes in the evidence."

During trial, the court reversed its pretrial ruling and allowed the Scotts to present evidence of the FDA's public health notices and 2012 letter. Bard moved for a mistrial, which the trial court denied. Alternatively, Bard requested a six-week continuance so it could recall certain witnesses. The trial court denied this motion as well.

Bard moved for a directed verdict on all claims. The trial court directed a verdict on manufacturing defect, fraud and breach of warranty, but denied the motion on negligence and failure to warn.

The jury returned a special verdict finding Bard was not liable for failure to warn. However, the jury found Bard was negligent and that its negligence was a substantial factor in Christine Scott's harm. The jury awarded Christine Scott $5 million in damages and awarded Roy Scott $500,000 for loss of consortium. The jury found Dr. Kannappan's negligence was not a substantial factor in causing the Scotts' harm but assigned 40 percent fault to her. Based on this finding, the trial court reduced the Scotts' noneconomic damages by 40 percent and entered judgment for $3.31 million for Christine Scott and $300,000 for Roy Scott.

Bard moved for judgment notwithstanding the verdict and for a new trial. Bard argued it was denied a fair trial because the trial court reversed its in limine ruling on the FDA's regulatory actions, the Scotts' counsel engaged in continuous misconduct, and one juror committed multiple acts of misconduct. The trial court denied these motions.

## DISCUSSION

**1.** ***Bard's appeal.***

Bard contends the trial court submitted erroneous negligence theories to the jury. Further, Bard argues, none of these theories are supported by substantial evidence. Bard additionally asserts the trial was tainted by evidence of postsurgery events, attorney misconduct and juror misconduct. We address the attorney misconduct and juror misconduct issues in the unpublished portion of this opinion.

### A. The negligence theories were properly submitted to the jury.

#### a. Negligent design.

The jury was instructed on negligent design as follows:

> "Christine Scott also claims that she was harmed by C.R. Bard's negligence and that it should be held responsible for that harm. To establish this claim, Christine Scott must prove all of the following:

> "1. That C. R. Bard designed the Avaulta Plus;

> "2. That C. R. Bard was negligent in designing the Avaulta Plus;

> "3. That Christine Scott was harmed; and

> "4. That C. R. Bard's negligence was a substantial factor in causing Christine Scott's harm."

On the basic standard of care, the jury was instructed:

> "Negligence is the failure to use reasonable care to prevent harm to oneself or to others.

> "A person can be negligent by acting or by failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation.

> "You must decide how a reasonably careful medical device manufacturer would have acted in C. R. Bard's situation."

On the standard of care for a product designer, the jury was instructed:

8.

"A designer of a product is negligent if it fails to use the amount of care in designing the product that a reasonably careful designer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

"In determining whether C. R. Bard used reasonable care, you should balance what C. R. Bard knew or should have known about the likelihood and severity of potential harm from the product against the burden of taking safety measures to reduce or avoid the harm."

With a claim based on products liability, the plaintiff may seek recovery on one of two theories, strict liability in tort or negligence. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 478.) Products liability focuses responsibility for defects, whether negligently or non-negligently caused, on the manufacturer of the completed product. (*Id*. at pp. 478-479.) Thus, under either theory, the plaintiff must prove that a defect caused the injury. This claimed defect may be either in the design or manufacture of the product. However, under a negligence theory, the plaintiff must also prove that the product defect was due to negligence of the defendant. (*Id*. at p. 479.)

Relying on *Brown v. Superior Court* (1988) 44 Cal.3d 1049 (*Brown*) and *Hufft v. Horowitz* (1992) 4 Cal.App.4th 8 (*Hufft*), Bard argues that the negligent design claim is barred because Bard is a medical device manufacturer. According to Bard, after the trial court directed a verdict on manufacturing defect and the jury found Bard was not liable for failure to warn, the "case against Bard should have ended there."

In *Brown*, the court held "that a manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." (*Brown, supra,* 44 Cal.3d at p. 1069, fn. omitted.) In *Hufft*, the court applied this strict liability restriction to implanted medical devices. (*Hufft, supra,* 4 Cal.App.4th at pp. 19-20.)

9.

The *Brown* court justified this exemption based on the special considerations that set prescription drugs sufficiently apart from other products.  The court noted that, although drugs might be safer if they were withheld until more dangerous side effects were revealed, "[p]ublic policy favors the development and marketing of beneficial new drugs, even though some risks, perhaps serious ones, might accompany their introduction, because drugs can save lives and reduce pain and suffering." (*Brown, supra,* 44 Cal.3d at p. 1063.)   If drug manufacturers were subject to strict liability, they might be reluctant to develop and market beneficial drugs because of fear of large adverse monetary judgments and the expense of strict liability insurance, costs that could place the medication beyond the reach of those who need it most.  (*Ibid.*)

Bard is correct that it cannot be held strictly liable for a design defect in Avaulta Plus.  However, being immune from strict liability does not in itself bar a negligence claim.  Unlike negligence, strict liability eliminates the necessity for the injured party to prove that the manufacturer of the product was negligent.  Rather, strict liability focuses not on the conduct of the manufacturer but on the product itself and holds the manufacturer liable if the product was defective. (*Brown, supra,* 44 Cal.3d at p. 1056.)

Accordingly, a manufacturer such as Bard may be subject to liability for negligence.  (*Brown, supra,* 44 Cal.3d at p. 1069, fn. 12; *Hufft, supra,* 4 Cal.App.4th at p. 23.)  In *Brown*, the court specifically noted that its conclusion did not mean that drug manufacturers are free of all liability for defective drugs.  "They are subject to liability for manufacturing defects, *as well as under general principles of negligence*, and for failure to warn of known or reasonably knowable side effects." (*Brown, supra,* 44 Cal.3d at p. 1069, fn. 12, italics added.)

Therefore, here, the trial court did not err in submitting the question of whether Bard was liable for negligently designing Avaulta Plus to the jury.  The jury was properly instructed on general negligence and the need to determine whether Bard used the

amount of care in designing the product that a reasonably careful medical device manufacturer would use.

### b. Negligent training.

The jury was instructed on negligent undertaking as follows:

> "The manufacturer of a prescription medical device has no duty to train a physician in using its medical device. However, if a manufacturer undertakes to train physicians and fails to exercise reasonable care in that undertaking, it may be held liable for harm caused to third parties as a result of its negligent undertaking. A negligent undertaking requires proof of the following:

> "1. The actor undertook, gratuitously or for consideration, to render services to another;

> "2. The services rendered were of a kind the actor should have recognized as necessary for the protection of third persons;

> "3. The actor failed to exercise reasonable care in the performance of the undertaking;

> "4. The actor's failure to exercise reasonable care resulted in physical harm to the third persons; and

> "5. Either:

>> "a. The actor's carelessness increased the risk of such harm, or

>> "b. The actor undertook to perform a duty that the other owed to the third persons, or

>> "c. The harm was suffered because either the other or the third persons reasonably relied on the actor's undertaking."

In general, there is no duty to take affirmative action to assist or protect another. (*Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307, 335, overruled on another point in *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 328-329.)

As the jury was instructed here, Bard had no duty to train physicians on the use of its Avaulta products.

"However, one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." (*Paz v. State of California* (2000) 22 Cal.4th 550, 558-559 (*Paz*).) The *Paz* court set forth the elements of a negligent undertaking claim. The instruction quoted above accurately reflects those requirements. (*Paz, supra,* 22 Cal.4th at p. 559.)

The *Paz* court noted that the negligent undertaking theory of liability subsumes the well-known elements of a negligence action, i.e., duty, breach of duty, proximate cause and damages. (*Paz, supra,* 22 Cal.4th at p. 559.) The foundational requirements for a negligent undertaking claim are that the defendant undertook the tasks alleged to have been performed negligently and the undertaking was to render services to another that the defendant should recognize as necessary for the protection of third persons. (*Id.* at pp. 559-560.)

Bard argues that its services were not of a kind Bard should have recognized as necessary to protect persons and that these services did not increase the risk of harm to Christine Scott. Therefore, Bard contends, the negligent undertaking theory should not have been submitted to the jury.

It is undisputed that Bard undertook to train physicians in the use of its Avaulta products. Contrary to Bard's position, this is not a situation where a non-doctor is injected into the practice of medicine. Bard hired physicians who specialized in urogynecology to conduct the training sessions. The majority of the training was physician-to-physician interaction.

Further, it is self evident that training physicians on the surgical technique for implanting Bard's Avaulta products is a type of service that is necessary to protect third

12.

persons, i.e., the physician's patients. Bard's expert, Dr. Neeraj Kohli, testified that some physicians may feel they need the training. Additionally, Bard presents the physicians who attend the training with a certificate of completion that the physicians often give to the hospital credentialing committee as evidence that they can competently conduct the surgery. Finally, it should have been apparent to Bard that improper training could increase the risk of harm to the physician's patients. Accordingly, the theory that Bard undertook to train physicians and thus had a duty to use due care in carrying out such training was properly submitted to the jury.

### c. Negligent misrepresentation.

The jury was instructed on negligent misrepresentation as follows:

"The Scotts claim[] they were harmed because Bard negligently misrepresented an important fact to the Scotts Doctor. To establish this claim, [t]he Scotts must prove all of the following:

"1. That Bard represented to [t]he Scotts Doctor that an important fact was true;

"2. That Bard's representation was not true;

"3. That although Bard may have honestly believed that the representation was true, Bard had no reasonable grounds for believing the representation was true when it made it;

"4. That Bard intended that [t]he Scotts Doctor rely on this representation;

"5. That [t]he Scotts Doctor reasonably relied on Bard's representation;

"6. That [t]he Scotts were harmed; and

"7. That [t]he Scotts Doctor's reliance on Bard's representation was a substantial factor in causing the Scotts harm."

Because the trial court directed a verdict in Bard's favor on the Scotts' fraud claim, Bard contends the negligent misrepresentation theory should not have been

13.

submitted to the jury. The fraud cause of action was based on the allegation that at some of the training sessions, one of the slides shown to the physicians during the power point presentation stated that Avaulta was FDA approved whereas it was in fact FDA cleared. In making its ruling, the trial court noted there was no evidence that this slide was presented to Dr. Kannappan. Further, Dr. Kannappan testified that she did not know what the slide said but thought the product was 100 percent safe. Thus, the court found there was no proof that Bard made that alleged misrepresentation of fact to Dr. Kannappan.

However, the Scotts relied on additional evidence to support their negligent misrepresentation theory. Dr. Kannappan testified that the training physician used by Bard, Dr. Tate, represented that the Avaulta products had few complications, if any, and that these potential complications were minor and could be treated on an outpatient basis in the doctor's office. According to Dr. Kannappan, Dr. Tate further stated that Avaulta was recommended for use in young women. Such statements could support a finding of negligent misrepresentation so long as the jury also found the other elements of the cause of action to exist.

Thus, the directed verdict on the fraud cause of action did not preclude a negligence finding based on negligent misrepresentation. Therefore, the trial court did not err in submitting this theory to the jury. Whether substantial evidence supports this theory is a separate issue.

### B. Substantial evidence supports the negligence verdict.

Here, the jury was presented with three negligence theories and returned a verdict without specifying which theory it relied on. Accordingly, the verdict will be sustained if any one theory is supported by substantial evidence and is unaffected by error. (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1157.) This "rule is based on the

14.

assumption 'that the jury found on the cause of action or theory which was supported by substantial evidence and as to which there was no error.'" (*Ibid*.)

Relying on *Lundy v. Ford Motor Co.* (2001) 87 Cal.App.4th 472, Bard contends that reversal is required. According to Bard, all three of the negligence theories were erroneously submitted to the jury and, if any one was erroneously submitted, the negligence verdict must be reversed. The rationale for this rule is that, while jurors are well equipped to analyze and weigh the facts, jurors cannot be expected to determine whether a particular theory submitted to them is contrary to law. Thus, there is no way to eliminate the likelihood that the jury chose the legally improper theory. (*Id.* at p. 480.)

However, as discussed above, all of the negligence theories were legally valid. Therefore, so long as at least one of these theories is supported by substantial evidence, the verdict will be upheld.

In reviewing the sufficiency of the evidence, the power of this court begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, to support the jury's findings. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) The evidence must be viewed in the light most favorable to the Scotts, giving them the benefit of every reasonable inference and resolving all conflicts in their favor. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) We may not substitute our view of the correct findings for those of the jury. Instead, we must accept any reasonable interpretation of the evidence that supports the jury's decision. Nevertheless, we may not defer to that decision entirely. Substantial evidence is not synonymous with any evidence. To be considered substantial, the evidence must be reasonable in nature, credible, and of solid value. (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)

### a. Negligent design.

Bard contends that the Scotts did not prove Bard negligently designed Avaulta Plus because they did not present evidence comparing Bard's conduct to other manufacturers in the industry. As the jury was instructed, to be negligent, a product designer must fail to use the amount of care in designing the product that a reasonably careful designer would use in similar circumstances.

As pointed out by Bard, the use of a vaginal mesh kit for the appropriate patient was the standard of care in 2007. However, there were design differences between the various manufacturers' products.

The Scotts' expert, Dr. Donald Ostergard, testified as to the differences between Avaulta Plus and other transvaginal mesh kits. Dr. Ostergard explained that Avaulta Plus has very stiff mesh arms. The design calls for the arms to be trimmed to fit the patient and when the mesh is cut, very sharp corners are left. Dr. Ostergard testified that Avaulta Plus is the only product with distal arms on a posterior implantation. Further, no other mesh product is designed to be placed as close to the anal sphincter as Avaulta Plus is. Erosion of these closely placed arms into Christine Scott's anal sphincter caused her to lose control of this muscle. Dr. Ostergard further testified that Avaulta Plus is the only product where the arms are pulled back outside the body through the buttocks. These arms are contaminated with bacteria from the vagina. Accordingly, the arms contaminate the tissue through which they are pulled and increase the chance of infection. Infection leads to mesh erosion. Christine Scott suffered such an infection.

Bard argues that Dr. Ostergard could not competently testify as to the standard of care for a transvaginal mesh kit manufacturer because he was critical of every manufacturer's transvaginal mesh product and had never used Avaulta Plus. Bard further contends that Dr. Ostergard's opinions were not substantial evidence of negligence

because he did not explain what a reasonable device manufacturer would have done differently.

Although Dr. Ostergard was critical of all transvaginal mesh kits and had never implanted Avaulta Plus, he was familiar with the design of various transvaginal mesh kits and was an expert in the field of urogynocology. Dr. Ostergard testified as to the differences between Avaulta Plus and other manufacturer's products and explained why the Avaulta Plus design was more likely to injure the patient. From this evidence, the jury could decide whether Bard acted as a reasonably careful medical device manufacturer when it designed Avaulta Plus.

Accordingly, the negligent design claim is supported by substantial evidence. Since only one theory is necessary to sustain the negligence verdict, we need not determine whether the negligent training and negligent misrepresentation claims are supported by the record.

### C. Bard was not denied a fair trial.

#### a. Postsurgery evidence of FDA actions.

When the trial court heard the in limine motions two months before trial, it barred evidence of postsurgery regulatory actions, including the FDA's 2008 and 2011 public health notices and 2012 letter requesting clinical trials. During trial, the court reversed its pretrial ruling and allowed the Scotts to present evidence of the FDA's public health notices and 2012 letter. Bard moved for a mistrial, which the trial court denied. Alternatively, Bard requested a six-week continuance so it could recall certain witnesses. The trial court denied this motion as well.

Bard contends the trial court erred in admitting the FDA's postsurgery regulatory actions. According to Bard, this evidence is irrelevant because a medical product manufacturer has a duty only with regard to information that was known or scientifically knowable at the time the product was used. Additionally, Bard asserts that this evidence

17.

is prohibited by Evidence Code section 1151. Bard further argues that the evidence should have been excluded under Evidence Code section 352 because its probative value was substantially outweighed by the risk of unfair prejudice, misleading the jury, and wasting time.

We review the trial court's rulings on the admissibility of evidence for an abuse of discretion. A court's discretion is abused where there is a clear showing that the ruling exceeded the bounds of reason, all of the circumstances being considered. Moreover, if the trial court errs, reversal of the judgment is not required unless the error resulted in a miscarriage of justice. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332 (*Saxena*).)

### i. Relevance.

Bard argues the FDA's postsurgery regulatory actions are irrelevant to the claim against it because, as a medical device manufacturer, Bard only had a duty with regard to information that was known or scientifically knowable at the time the product was used. As noted above, the 2008 and 2011 public health notices were sent to physicians and discussed the risks that were already stated in the Avaulta Plus instructions for use. These notices recommended that physicians obtain specialized training for each mesh placement technique and that they be vigilant for potential adverse events. The 2012 letter was sent to approximately 30 manufacturers, including Bard, and requested the manufacturers to conduct postmarket clinical studies or collect clinical data for transvaginal mesh.

Bard is correct that, initially, this evidence was marginally relevant at best. Any liability of Bard for negligence or failure to warn was tied to its conduct and knowledge before the surgery. However, during its opening statement, Bard caused this evidence to become relevant when it intimated that the FDA had continued to monitor and regulate transvaginal mesh and had taken no action. While the in limine ruling excluding the

18.

FDA regulatory actions was in place, Bard explained to the jury that Avaulta Plus was cleared and then stated:

> "Now, once the FDA does that and says you may sell, is that the end of it? The answer is a very definitive no. And that is that the FDA is monitoring and regulating these products throughout and they always do that. And so one of the things that is required by regulation [is] complaint handling so if anyone has a complaint or has an outcome if the company finds out it has to be reported to the FDA and there are certain rules and regulations about that, the complaints and the trending and tracking of those complaints would go to the departmental heads, the management review to keep an eye on to see is there anything out of the usual here or is this the incident rate about what we see for other product."

Thus, the regulatory evidence became relevant to disabuse the jury of the notion introduced by Bard that the FDA was closely monitoring transvaginal mesh kits and had found no cause for concern about their safety.

Moreover, Bard was advised early on by the court on how its opening statement had changed the situation. Shortly after Bard gave its opening statement, the trial court expressed its concern that Bard had "made it clear that BARD is going to say we had FDA approval and then attempt to exclude the fact that in 2011[*sic*] the FDA pulled the plug on BARD and others." The court then advised Bard that it was giving it "fair warning" that the court thought that it was "unfairly limiting" the Scotts and that Bard could not "have it both ways."

### ii. Evidence Code section 1151.

Bard further argues that the postsurgery FDA regulatory actions were inadmissible under Evidence Code section 1151. That section provides:

> "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event."

19.

This rule excluding evidence of subsequent remedial or precautionary measures originally rested on the notion that such measures were completely irrelevant to the issue of the defendant's negligence at the time of the accident. (*Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 119 (*Ault*).) Despite courts recognizing several exceptions to this rule over the ensuing years, it has been retained in negligence cases as a matter of "public policy." Evidence Code section "1151 rests explicitly on this 'public policy' rationale." (*Ault, supra,* at p. 119.) The draftsmen's comment to this section explains its purpose as follows: "'The admission of evidence of subsequent repairs *to prove negligence* would substantially discourage persons from making repairs after the occurrence of an accident.' (Italics added.) [Citation.]" (*Ibid.*)

Accordingly, the court in *Ault* concluded that Evidence Code section 1151 was not intended to apply to cases founded on strict liability in a products liability action. (*Ault, supra,* 13 Cal.3d at p. 118.) When the context is transformed from a typical negligence setting to modern products liability, the public policy assumptions justifying this evidentiary rule are no longer valid. (*Id.* at p. 120.)

Thus, Evidence Code section 1151 would not have required the exclusion of the FDA regulatory actions if this case were based only on strict liability. However, the Scotts also claimed Bard was negligent.

Nevertheless, there is another factor that distinguishes these subsequent remedial actions from the typical negligence case. Here, the postsurgery actions were taken by a third party, the FDA. Since imposition of liability is not sought against the person taking the remedial action, the policy consideration of not wanting to discourage persons from taking remedial action that might prevent further injury is absent. Therefore, the FDA regulatory actions were not inadmissible under Evidence Code section 1151. (Cf. *Magnante v. Pettibone-Wood Manufacturing Co.* (1986) 183 Cal.App.3d 764, 768.)

20.

However, testimony that Bard took Avaulta Plus off the market in response to the FDA's 2012 letter was also admitted.  Nevertheless, even if improper, any error in admitting that evidence was harmless.  Bard repeatedly and emphatically explained that Avaulta Plus was taken off the market only because it had become obsolete.

### iii. Evidence Code section 352.

Evidence Code section 352 provides that the court may, in its discretion, exclude evidence if its probative value is substantially outweighed by the probability that it will create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

Bard contends this section required exclusion of the FDA postsurgery regulatory actions.  According to Bard, the prejudice was acute because the FDA acts for reasons that are foreign to jurors.  Bard further notes the FDA never found Avaulta Plus to be defective in any respect and required all transvaginal mesh manufacturers to conduct a postmarket study.

The prejudice that exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice that naturally flows from relevant evidence.  The prejudice referred to in this section applies to evidence that uniquely tends to evoke an emotional bias against the defendant and that has very little effect on the issues.  (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 150 (*Donlen*).)  Further, the prejudice must *substantially* outweigh the probative value.  (*Ibid.*)

In deciding whether the probability of *substantial* danger of prejudice *substantially* outweighs probative value, trial courts enjoy broad discretion.  Accordingly, "'[a] trial court's exercise of discretion "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*Donlen, supra,* 217 Cal.App.4th at p. 150.)

Here, the trial court's admission of the FDA regulatory actions was not so arbitrary, capricious or patently absurd that it resulted in a manifest miscarriage of justice. Although before trial the jurors might not have understood the different FDA actions, during trial various witnesses explained what the FDA's actions meant. Further, the jury was made aware that the FDA did not find Avaulta Plus to be defective and that the 2012 letter was sent to all transvaginal mesh manufacturers. Thus, the jury was able to evaluate the FDA regulatory actions in context.

### b. The mid-trial reversal of the in limine ruling and continuance denial.

Bard contends that, regardless of whether the FDA regulatory action evidence was admissible, the trial court abused its discretion when it changed its in limine ruling and admitted that evidence mid-trial. According to Bard, it was prejudiced because (1) it lost the opportunity to examine prospective jurors on the bias they may have due to misinterpreting the FDA's actions or Bard's decision to stop selling the product; (2) it lost credibility before the jury because it had not addressed the subject; and (3) it was forced to read deposition testimony from witnesses who had already testified and thereby highlighted the subject.

Bard further argues the trial court abused its discretion in denying its motion for a continuance. Bard asserts that after the court changed its ruling, it needed time to regroup because it had released witnesses and had not gathered necessary documentary evidence.

Again, we apply the abuse of discretion standard to the trial court's action. Accordingly, we will not disturb the rulings in the absence of a clear showing that the trial court exceeded the bounds of reason, all of the circumstances being considered, i.e., the court's rulings were arbitrary, capricious, or patently absurd. (*Saxena, supra,* 159 Cal.App.4th at p. 332; *Donlen, supra,* 217 Cal.App.4th at p. 150.)

In limine rulings are tentative and the court retains discretion to make different rulings as the evidence unfolds. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1174.) As discussed above, Bard's opening statement caused the FDA regulatory action evidence to become relevant and the court warned Bard shortly thereafter that Bard's remarks had changed the situation. Moreover, the parties had fully explored this evidence during discovery. It was not a situation where the plaintiff was attempting to bring in new facts or theories of liability during the trial. Under these circumstances, the court's mid-trial ruling on the admissibility of the FDA regulatory action evidence was not arbitrary, capricious or patently absurd.

Bard also has not demonstrated that the court's rulings resulted in a miscarriage of justice. The court had made it clear to both parties when it made the in limine rulings that they were subject to change and Bard was aware of this when it questioned the potential jurors.

As far as the order of evidence and the reading of deposition testimony, the court instructed the jury:

> "Now, the Court decides what evidence is admissible and what evidence is not admissible during trial. Sometimes evidence is not admissible at the beginning of trial but will become admissible during trial. You must not guess or speculate as to why any evidence was not introduced … earlier in the case or was not discussed by counsel during opening statements. The decision as to whether evidence is admissible rests solely with the Court, not the parties. You may not give any evidence more or less weight based on [when] it was introduced during the trial."

The jury was also instructed that "you must consider the deposition testimony that was read to you in the same way as you consider testimony given in court."

"Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804

23.

(*Cassim*).)  In light of this presumption, we must conclude that the above instructions cured any potential prejudice due to the order of the evidence and the supplemental deposition testimony.

Similarly, the trial court's denial of Bard's motion to continue the trial for six weeks was not arbitrary or capricious.  Because the trial was well underway, a lengthy continuance would have been unreasonably disruptive.  Further, Bard was able to use deposition testimony for the witnesses who had become unavailable for recall.

### c. The alleged attorney misconduct. [*]

Bard argues the Scotts' counsel committed prejudicial misconduct when he "blurted out excluded topics before the jury and lambasted the court."  Bard further contends that parts of counsel's closing argument were improper.

Before the trial court reversed its ruling on the admissibility of the FDA's postsurgery actions, the Scotts' attorney asked Dr. Jimmy Ross, one of Bard's experts, "Are you now aware that Johnson & Johnson is withdrawing from the market 100 percent worldwide on all these vaginal mesh kits?"  Bard's counsel immediately objected and the matter was taken up outside the presence of the jury.

When the jury returned, the court stated:  "Ladies and gentlemen, let me remind you that what the lawyers say is not evidence.  And only what the witnesses say is the evidence that you'll rely on in this case."  Thus, the jury was immediately instructed to disregard the Scotts' attorney's comment.  We must presume the jury followed and applied this instruction.  (*Cassim, supra,* 33 Cal.4th at pp. 803-804.)  Thus, these remarks were not prejudicial.

Bard also points to the jury hearing comments about other cases against Bard as being prejudicial.  While reading a deposition transcript to the jury, the Scotts' attorney

---

[*]	See footnote, *ante*, page 1.

24.

inadvertently read a section that should have been excluded. This included the comment "I think we are told we have at least a few hundred lawsuits." Later, while being cross-examined by Bard's counsel about the Scotts' pending action against her, Dr. Kannappan stated "And there are 100 other cases in New York also from what I heard from my counsel." The court immediately admonished the jury as follows:

> "Ladies and gentlemen, whether there is one lawsuit or a million -- and I can assure you there is not a million -- is of no consequence in this case. And you'll disregard any comment from anyone in the courtroom about any lawsuit other than the Scott versus BARD lawsuit, which brings us all together. It is not evidence. I declare it as such, and you'll disregard Dr. Kannappan's comment."

Again, we must presume the jury followed and applied this instruction and disregarded the comments regarding other lawsuits against Bard. Thus, the improper comments did not result in a miscarriage of justice.

Bard further objects to the Scotts' attorney's closing argument where the attorney emphasized the postsurgery FDA action. Counsel stated Bard took the product off the market in response to the FDA's 2012 letter and discussed how the product was not FDA approved as Bard and its salespeople had claimed.

However, as discussed above, the trial court did not abuse its discretion when it ruled the evidence regarding the FDA's actions was admissible. Further, in conducting closing argument, the attorneys have wide latitude to discuss the case. Counsel may vigorously argue the case and has the right to state fully his or her views as to what the evidence shows and as to the conclusions to be fairly drawn. The adverse party cannot complain if the reasoning is faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury. (*Cassim, supra,* 33 Cal.4th at p. 795.)

In making the arguments objected to, the Scotts' attorney was giving his view of the conclusions the jury could draw from the evidence that was admitted. Bard did take Avaulta off the market and at one point erroneously claimed Avaulta was FDA approved

25.

when it was FDA cleared. The Scott's attorney did not assume facts not in evidence or invite the jury to speculate. The closing argument was not improper.

During a discussion outside the presence of the jury, one of the attorneys representing the Scotts, Eugene Lorenz, engaged in a heated discussion with the trial court that Bard characterizes as haranguing and the court considered berating. Bard argues that certain comments made by Mr. Lorenz during this discussion constituted prejudicial misconduct.

Our review of the trial record discloses that, in making the objected to statements, Mr. Lorenz impugned the integrity of the court. Examples of his insolent comments include:

1. "They deserve some better brand of justice than what is going on here." (Referring to rulings made by the trial court.)

2. "It would be nice if you'd read some of our memos. It would be nice if you would sign the 3294 as promised. But you know the plaintiffs don't get much time here."

3. "BARD [defendant] owns the courthouse."

4. "But let's have a little bit of fairness to the plaintiffs, and the individual here. Just a little bit. Tiny bit of justice."

These statements were contemptuous of the trial judge. They are contemptuous on their face because they impugn the trial judge's integrity by suggesting he has failed to perform his duty to guarantee a fair trial. (*Hanson v. Superior Court* (2001) 91 Cal.App.4th 75, 84-85.) There is no possible justification for the insulting tone and disparaging content of these remarks, which clearly crossed the line that separates advocacy from contempt. The trial court would have been well within its discretion in citing Mr. Lorenz for direct contempt. Although the trial court admonished Mr. Lorenz against interrupting him and at one point told him that his advocacy was approaching contempt, he did not cite him for contempt.

26.

It is the duty of an attorney to "maintain the respect due to the courts of justice and judicial officers." (Bus. & Prof. Code, § 6068, subd. (b).) An attorney commits direct contempt when he impugns the integrity of the court by statements made in open court. Insolence to the judge in the form of insulting words or conduct in court has traditionally been recognized in the common law as constituting grounds for contempt. (*In re Buckley* (1973) 10 Cal.3d 237, 248.)

The trial judge is an experienced and able one, which even Mr. Lorenz acknowledged when he said to the court: "I think you do an excellent job of managing your jury, your whole staff. And you do one of the best jobs. Your bailiff, your clerks, the court reporter, I mean, the human part of it is done very, very well. And you are on the ball with rulings. You are good…" Notwithstanding these compliments, he leveled insulting remarks at the court which directly challenged the judge's fair-mindedness.

It is understandable why trial judges are reluctant to initiate contempt proceedings. Contempt is a remedy of last resort and should be used with great prudence. (*McCann v. Municipal Court* (1990) 221 Cal.App.3d 527, 536.) There are numerous appellate decisions reversing contempt orders. (*Id.* at p. 537.) The Commission on Judicial Performance has disciplined judges for abusing their contempt powers. Nevertheless, it is a judge's obligation to maintain the respect due to the court. (*In re Ciraolo* (1969) 70 Cal.2d 389, 394-395.) It is also an attorney's duty to maintain that same respect. (Bus. & Prof. Code, § 6068, subd. (b).)

Mr. Lorenz violated his duty to maintain the respect due to the courts of justice and judicial officers. However, he made these intemperate remarks to the court outside the jury's presence. Thus, the remarks were not prejudicial. Even so, if Mr. Lorenz reflects back on what he said to the trial judge, he should feel a sense of shame and regret and consider himself fortunate that the trial judge refrained from summarily finding him in contempt.

***d. The alleged juror misconduct.****

Bard argues that various instances of juror misconduct prejudicially tainted the trial and thus the trial court erred in denying Bard's motion for a new trial.

Trial by jury is an inviolate right that is secured to all and includes the right to 12 unbiased and unprejudiced jurors. (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 506.) Jury misconduct, unless shown by the prevailing party to have been harmless, will invalidate the verdict. (*Andrews v. County of Orange* (1982) 130 Cal.App.3d 944, 954 (*Andrews*), disapproved on another point in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5).)

"It is the trial court's function to resolve conflicts in the evidence, to assess the credibility of the declarants, and to evaluate the prejudicial effect of the alleged misconduct." (*Andrews, supra,* 130 Cal.App.3d at p. 954.) Accordingly, the appellate court will accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 624 *(Donovan)*.)

A trial court has wide discretion in making such a ruling. Therefore, the appellate court will accord great deference to the trial court's evaluation of the prejudicial effect of jury misconduct. However, where, as here, the appellate court is reviewing an order *denying* a motion for new trial based on jury misconduct, the appellate court must review the entire record, including the evidence, and determine independently whether the act of misconduct, if it occurred, prevented the moving party from having a fair trial. (*Andrews, supra,* 130 Cal.App.3d at pp. 954-955.) Bard, as the moving party, bears the burden of establishing juror misconduct. (*Donovan, supra,* 167 Cal.App.4th at p. 625.)

---

\* See footnote, *ante,* page 1.

28.

Bard's juror misconduct allegation focuses primarily on Juror 14. Bard first points out that Juror 14 improperly posted on Twitter during trial showing his disdain for the case. For example, this juror posted "FUCK THE COURT SYSTEM" and "Idgaf about this mutha fuckin case! I'll tell it on twitter. The case is a waste of my damn time." Shortly before the verdict was announced, Juror 14 posted "Damn, these niggas Finna get paid up the ass."

Bard was monitoring jurors' Twitter accounts during the trial and became aware of the above tweets before the verdict. However, Bard did not bring these posts to the trial court's attention. As to the last post, Bard states it was aware of the post before the verdict was read but did not report this post to the court because it did not know what it meant.

In seeking a new trial on the ground of juror improprieties, the litigant and its attorney must show that neither was aware of the misbehavior until after the verdict was returned. (*Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 103.) "The rule is well settled that when at any time during trial a party or his counsel becomes aware of facts constituting misconduct or irregularity in the proceedings of the jury, he must promptly bring such matters to the attention of the court, if he desires to object to it, or he will be deemed to have waived the point as a ground for a motion for a new trial." (*Ibid*.) This prevents a party from gambling on the outcome of the jury's deliberations while secretly preserving the error to be raised on a motion for a new trial in the event of an unfavorable verdict. (*Ibid*.)

Here, by not bringing these Twitter posts to the trial court's attention, Bard forfeited this point as a ground for its new trial motion. In fact, Bard conceded this fact during the hearing on its new trial motion stating that it was alleging misconduct on the part of Juror 14 "based solely on what was done during deliberations." Further, as noted by the trial court, there was an alternate juror available.

Based on a declaration executed by Juror 7, Bard alleges that it is entitled to a new trial because Juror 14 did not properly deliberate. According to Juror 7, during the entire deliberation process Juror 14 did not actively participate. Juror 7 stated that Juror 14 was either asleep or busy typing on his cell phone and, when it was time to vote on a specific question, Juror 7 had to wake Juror 14 up whereupon Juror 14 would ask about the current vote and then vote with the majority.

However, the jury foreman, Juror 13, executed a contradictory declaration. Juror 13 stated that he had read the declaration executed by Juror 7 and that what Juror 7 describes "is not what I observed in the jury room. I took my heavy responsibilities as jury foreman very seriously and ensured that all jurors took part in the deliberations, including … Juror 14." According to Juror 13, his declaration "accurately reflects my work as foreman and the jury's deliberations."

A refusal to deliberate constitutes juror misconduct. The parties are entitled to the participation of all 12 jurors. (*Andrews, supra,* 130 Cal.App.4th at p. 959.) Further, here, the vote was nine to three in favor of finding Bard negligent and Juror 14 voted with the majority. Nevertheless, the evidence presented a factual conflict. It was up to the trial court to assess the credibility of the declarants and to resolve this conflict. (*Id.* at p. 954.)

Bard notes that during the hearing the trial court observed that "we basically have dueling affidavits between the foreman who says I was doing my job and [Juror 7], I guess, who says [Juror 14] wasn't participating. [¶] I'm not sure that I can make -- you are asking me, I think, to make a factual determination based on these two affidavits. And I'm not sure that is not an inappropriate exercise on the part of the trial court. [¶] So go ahead." According to Bard, this discourse demonstrates the trial court did not exercise its discretion in ruling on the new trial motion. Rather, the trial court "punted."

However, this was not the end of the hearing. After the court stated the above, Bard's counsel urged the court to find both affidavits were admissible. Counsel then

argued that the affidavits were not contradictory in that Juror 13 only stated that he did not observe what Juror 7 observed.

At the conclusion of the hearing, the court ruled "I believe that the evidence -- that the competition between [Juror 13's] and [Juror 7's] declarations, both are admissible, support that there was deliberation." Accordingly, the trial court assessed credibility and resolved the factual conflict. Having observed the jurors during the trial, the court was in a position to make this determination. Further, based on Juror 13's declaration, substantial evidence supports this finding.

Bard additionally argues that "passive" juror misconduct occurred and tainted the trial. During the trial one juror informed the court that he had seen a television ad stating that the transvaginal mesh had been recalled. When questioned by the trial court, this juror at first was unsure that he could be fair. However, the juror agreed that he could follow the law and would not consider this ad as evidence. We must presume that this juror so followed and applied the court's instructions. (*Cassim, supra,* 33 Cal.4th at pp. 803-804.)

According to Bard, another instance of "passive" misconduct occurred when Juror 7 received unsolicited emails advertising mesh litigation. However, as Juror 7 stated in his declaration, he followed the trial court's instructions and did not open these emails. Moreover, as noted by the trial court, Bard was not prejudiced by Juror 7's receipt of these emails because Juror 7 voted in favor of Bard on the negligence claim.

In sum, the record supports the trial court's determination that Bard was not denied a fair trial.

## 2. *The Scotts' appeal.*

The jury found that Bard was negligent and that its negligence was a substantial factor in causing harm to Christine Scott. The jury also found that Dr. Kannappan was negligent. However, the jury found that Dr. Kannappan's negligence was *not* a

31.

substantial factor in causing Christine Scott's harm. Nevertheless, the jury determined that Dr. Kannappan was 40 percent at fault leaving Bard 60 percent at fault. Based on the jury's comparative fault finding, the trial court reduced the Scotts' $5.5 million award to $3,610,000.

The Scotts argue that it was necessary to instruct the jury on medical professional negligence to support the apportionment and, because the jury was not so instructed, the trial court erred in reducing the damages.

In a personal injury action based upon comparative fault, each defendant is liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of fault. (Civ. Code, § 1431.2.) However, it is not necessary that all persons at fault be parties to the action. Rather, a defendant may attempt to reduce its share of liability for noneconomic damages by seeking to add nonparty joint tortfeasors. Nevertheless, there must be substantial evidence that a nonparty is at fault before damages can be apportioned to that nonparty. (*Wilson v. Ritto* (2003) 105 Cal.App.4th 361, 367 (*Wilson*).)

Apportionment of noneconomic damages is a form of equitable indemnity in which a defendant may reduce its obligation to pay damages by establishing others are also at fault for the plaintiff's injuries. Accordingly, the burden is on the defendant to prove fault as to those nonparty tortfeasors. (*Wilson, supra,* 105 Cal.App.4th at p. 369.)

Fault in the context of medical treatment is measured by the standard of care in the medical community. (*Wilson, supra,* 105 Cal.App.4th at p. 369.) Therefore, Bard was required to prove, with expert testimony, that Dr. Kannappan, a nonparty, breached the medical standard of care. (*Chakalis v. Elevator Solutions, Inc.* (2012) 205 Cal.App.4th 1557, 1570.) The record supports such a finding.

Plaintiff's expert, Dr. Ostergard, testified that it was his "opinion that the surgical technique used during Christine Scott's January 9, 2008 surgery, the one day Avaulta

training seminar and patient post surgery care are below the requisite standard of care expected of a physician practicing obstetrics and gynecology in Bakersfield, California." Dr. Kohli, one of Bard's experts, testified that he was asked by Bard to "review records and render an opinion as to the standard of care regarding this case." Dr. Kohli then opined that Dr. Kannappan fell below the standard of care when she implanted more products than Christine Scott needed.

The Scotts' objection to the jury's finding that Dr. Kannappan was 40 percent at fault is based on the instructions given. The jury was instructed:

> "C. R. Bard claims that the negligence of Dr. Kannappan and Dr. Klis contributed to Christine Scott's harm. To succeed on this claim, C. R. Bard must prove both of the following:

> "1. That Dr. Kannappan and/or Dr. Klis were negligent; and

> "2. That this negligence was a substantial factor in causing Christine Scott's harm.

> "If you find the negligence of more than one person, including C. R. Bard, Dr. Kannappan and Dr. Klis, was a substantial factor in causing Christine Scott's harm, you must then decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form. The percentages must total 100 percent."

The jury was also instructed on the basic standard of care as set forth in section 1.A.a. of this opinion. However, despite the jury being asked to determine whether a medical professional was negligent, the jury was *not* instructed on the medical standard of care.

"The standard of care in a medical malpractice case requires that medical service providers exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215.) This standard of care is a matter peculiarly within the knowledge of experts and therefore expert testimony is

required to "prove or disprove that the defendant performed in accordance with the prevailing standard of care." (*Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 523.)

Thus, the medical standard of care is more specific than the general standard of care and, unlike general negligence, requires expert testimony. Accordingly, it is more difficult to prove a defendant fell below the medical standard of care than it is to prove a defendant fell below the general standard of care.

The Scotts argue that, because Bard had the burden to prove Dr. Kannappan was negligent, Bard cannot benefit when the jury was not instructed on the medical standard of care. Therefore, the Scotts contend, the jury's 40 percent fault finding cannot stand and the trial court's reduction in the award must be reversed.

However, it was in the Scotts' best interest for the jury to find that Dr. Kannappan was not at fault. Thus, it was also in the Scotts' best interest for the jury to be instructed on and apply the more specific standard of care. Nevertheless, the Scotts acquiesced in the giving of incomplete instructions on Dr. Kannappan's fault. This put the Scotts in a "win win" position. By acquiescing to the absence of an instruction on the medical standard of care, the Scotts could wait and see what the jury did and then, if the jury found Dr. Kannappan was partially at fault, argue that the finding could not stand because the jury was not instructed on the medical standard of care. We conclude that, under these circumstances, the Scotts are estopped from asserting this instructional error on appeal. (Cf. *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.)

The Scotts further argue there can be no apportionment of fault because there was no causation finding. The jury answered "no" to the question "Was Dr. Tillaikarasi Kannappan's negligence a substantial factor in causing Christine Scott's harm?" but apportioned 40 percent fault to Dr. Kannappan. There is an inconsistency between these two answers. The jury needed to find that Dr. Kannappan's negligence was a substantial factor before it could apportion fault to Dr. Kannappan.

34.

This inconsistency rendered the special verdict "'hopelessly ambiguous.'" (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*).) Nevertheless, based on the absence of a causation finding, the Scotts argue this court should reverse the apportionment finding. In other words, the Scotts urge this court to ignore the 40 percent fault finding and modify the judgment to reflect no apportionment of fault to Dr. Kannappan. However, "'[t]he appellate court is not permitted to choose between inconsistent answers.'" (*Zagami, supra,* 160 Cal.App.4th at p. 1092.) We cannot infer findings in favor of the Scotts. (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 542.) Therefore, this argument fails.

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

_____

LEVY, Acting P.J.

WE CONCUR:


_____

KANE, J.


_____

DETJEN, J.

35.